Ali Golchan representing the petitioner Mr. Golkar. This is a simple case of credibility issue. The judge pretty much in his record admits that this is a Christian Iranian convert that faces certain persecution in Iran. The country reports the judge's own admission in his oral decision states that basically that if he finds that the person is credible, that he will find that he deserves asylum and qualifies asylum as a matter of law. Counsel, that's the crux of the case in terms of whether or not there was an adverse credibility determination regarding the knowledge of the tenets of Christianity was supported by substantial evidence. Could you address that, please? Thank you, Judge. I'll be happy to. Your Honor, the respondent, the critical issue in court, the respondent was able to articulate his thought process, his belief in Christianity, where he had a proper representation. He had an interpreter that was competent to provide him the translation of technical Christian terms that in Farsi, from Farsi to English, are meaningless. And as such, he was not able to answer many questions. If you read through the record, Your Honor, for example, one of the terms they used, it said, the term for John the Baptist is... Baptism. The baptism. He said he had been baptized, and then he was asked to define what baptism is, right? That is correct, Your Honor. And he couldn't explain what baptism was? Your Honor, baptism in a different language has different words for it. For example, in Persian Farsi, there's no term for baptism. They have a different name for it. And the interpreter was not able to articulate that. If there's no word for it, how can someone be a Christian in a country where Farsi is spoken if the concept of baptism cannot be explained? Your Honor is correct. I correct myself. There is a word for it, but it's not an English word. It has to be properly translated. For example, because I'm a Farsi speaker, it's called Abipak. It's a totally different term in Farsi for Persian-speaking Christians than it is for English-speaking Christians. In court, for example, in a transcript... Well, that's true for every language. Sure. Pretty much. In court, the professional interpreter was present in court. To his credit, he was able, for example, to translate the terms, for example, for John the Baptist. For example, his name is Yahya, and he's not John. And he was able to translate that. He was able to articulate that. The respondent was asked, for example, what is his favorite chapter from the Bible? And he said, this is the part where Jesus goes to the Jordan River, and he was baptized by Yahya, not by John the Baptist, as we know it. So these terminologies were able to properly be translated at asylum, before I.J., where a competent interpreter was present. Did the I.J. mention the fact that the interpreter was not, the non-certified interpreter was not brought in to confess? Did the I.J. confirm that she had difficulty with the Christian terminology? Didn't the I.J. also point that fact out? That the person who was interpreting for him in Anaheim didn't come to the asylum hearing to say, well, I didn't understand these Christian words, and I didn't know how to convey the concept? Unfortunately, it doesn't seem like the opportunity was... that the respondent petitioner was unnoticed, that he had to produce that translator. I mean, but if that's the point, if that's his point, that the reason he was not able to explain was because it wasn't interpreted properly, isn't that notice? I mean, if he's bringing the issue up himself, why would he have to be noticed about the importance? Your Honor is correct. The respondent was asked, when he was asked, if he was able to explain. But as far as having the interpreter, actually the person who translated, come and testify, were, for example, if the purpose of that hearing was not asylum hearing, de novo hearing, and it was said, the judge would have outset said, this is a credibility hearing, come and prove to me that you will not properly represent his asylum interview, he would have had, for example, this was an effective assistance of counsel, for example, a rehearing of some sort. For sure he would have brought in all the evidence, your documents, evidence, for example, the interpreter to testify that, yes, I was not competent to translate those terms. But this was not the case. There was this credibility issue where the focus of the hearing turned into a credibility issue during the asylum hearing, which is supposed to be de novo. All the asylum issues are all reviewed by the judge, by the statute, by the regulations. The judge reviews it, the immigration judge, and a de novo case. But the judge can look at inconsistencies in prior representations that were made in the application, the declaration, and the interview. Were the judge, Your Honor, were the judge asked those questions, respondent, the petitioner was able to explain? Was, for example, he asked them, okay, because this is a de novo, the judge asked him, okay, now tell me about Christianity. What is your knowledge of Christianity? He was able to explain. He was able to articulate those issues for where he was not a representative, he was not. What about the fact that he wasn't able to bring in any proof of membership in a charge? Your Honor, the crux of the issue is, are his explanations, they basically are plausible. Is this possible, plausible? Iran is a country that prosecutes or persecutes apostasy, and he was going to a church that members are, he had testified 95 percent of Iranian origin. They're afraid, they don't want to meddle, and the term used, they do not want to meddle, in immigration affairs, because for obvious reasons, they have family members in Iran, they don't want to get involved having their names brought into court. Talk about that, they're also Christian converts. The Protestant church where he went to is generally converts. Iranian original Christians are Armenians, Chaldeans, and some Roman Catholics. So what we know is common denominations, common churches that have flourished throughout the United States, Methodists, Baptists, whatever, Mormons. You can't go down to the block in Tehran and find a church like that. There are no churches that exist. The church where they're converts, none exist. In fact, the expert who attached the letter, talked about Christian life in Iran, said they can't go down to the block and they can't even perform a baptism. But this was the church in the United States. That's correct. We're not talking about the church in Iran, we're talking about the church in the United States where he was unable to get a certificate of membership. That is correct. The Respondent testified that, you've got to realize the totality of the Respondent's testimony and that this would make sense, what he's talking about. Throughout his testimony, he has never embellished being persecuted, tortured, anything like that. He just said he was fired from a job. That's not even related to his asylum case. His case came into being when he said he accepted Christ and he got a call from his mother that his life is in danger if he goes back to Iran. And then he went to Christian church here and church members would not provide him, they do not want a medal, including the priests at the church, they don't want a medal in immigration affairs. And that's a plausible explanation. They do not want to have their names brought up. But are we compelled to accept that explanation? Because that's our standard of review. We have to be compelled to accept that explanation. Your Honor, I understand that, Your Honor. There are certain cases where there is 10 percent chance, possibility, the chance that this man is a Christian. And the Iranian authorities know he's a Christian. He's that man. But on the adverse credibility determination, the evidence must compel us to overrule the determination that's made by the IJ. That's a very high hurdle. Your Honor is correct. The question is, was all the issues properly explored at the hearings before immigration judge? And it is our contention that it was not. He was not given a full opportunity to explain, provide collaborative evidence where the judge would require them. And it's a critical error to send someone in that situation back to Iran where his life is in danger. Did you want to? You're almost out of time. Would you like to? I'll give you a minute to rebut. Thank you. Good morning, Your Honors. May it please the Court. Charles Cantor on behalf of the Attorney General. I think Judge Rawlinson was right to focus on this aspect of corroboration, because I think that's really the central issue in this case. Under Manraj Singh Sidhu, which is cited in our brief, and Mahia Pais, it's the predecessor case to that regarding corroboration of a conversion. In that case, it was a Nicaraguan converting to becoming a Jehovah's Witness. And those cases stand for the proposition that where an IJ has reason to question the credibility of an applicant, and the applicant fails to provide corroborating evidence, and provides no explanation for such failure, an adverse credibility finding will withstand appellate review. I should also mention, since briefing in this case, the new provision, most of the corroborations that we've seen, the credibility provisions of the REAL ID Act don't apply here, because the application was filed before May 11, 2005. However, the provision regarding the availability of corroborating evidence at 8 U.S.C. 1252b-4 does apply. That applies to all orders of removal issued currently pending or on review as of May 11. And that says, no court shall reverse a determination made by a trier of fact with respect to the availability of corroborating evidence unless the court finds that a reasonable trier of fact is compelled to conclude that such evidence is unavailable. Basically, that's applying the substantial evidence standard to the availability of corroborating evidence. I think that might affect this Court's precedent a little bit to the extent that corroborating evidence before was required to be available, and I'm not sure that it actually is going to affect the result in this case, because the corroborating evidence here is easily available. What was supposed to be the corroborating evidence? Well, there are two different ways that Mr. Golkar could have corroborated his testimony. First is knowing, and he was on notice, that there was a question about why couldn't she say this, why couldn't she say that. He could have easily provided, if not his friend who interpreted it herself, if she couldn't be there personally, he could have provided an affidavit, a statement on penalty of perjury, even just a letter, just anything from her to say, it turns out that I could not understand, I wasn't able to translate some of the questions that were asked of me. Instead, what we have is his sort of after-the-fact explanation that, well, she said later on that she couldn't explain some of these things. His friend, the translator's sister, was present there at the courtroom. This isn't a situation where it's a government-provided translator that, you know, it's hard to approach. You don't know who it is. This is someone he knows personally. His sister's able to be there to attend the hearing with him. I think that's easily available. The second piece of corroborating evidence was, as mentioned earlier... Did they actually ask him where she was? I can't remember. I think there was some confusion. Was it this lady or is it the lady's sister? So it was asked. But I think more importantly, as far as having a fair notice or an opportunity to present his case, it was Mr. Golkar's attorney who raised these issues in the first place. He knew that there was a problem. He knew that he was asked to provide some detail as to his conversion. He couldn't provide any at all. And then later on at the hearing, he's able to give this detailed and involved testimony. The second piece of corroborating evidence is his membership in a church here in the United States. He claimed in his testimony that he was friends with everyone at the church. He'd been attending as of the time of the hearing. He'd been attending for over a year. The immigration judge does not have to accept every explanation that a petitioner gives. Especially when an immigration judge who hears thousands of these cases per year and regularly sees... I think this Court is aware in these removal proceedings, it's a rare case that you don't find some letter from some church or some religious organization saying, you know, this is a good person. He goes here. We know him. Anything like that. To say that this church of however many members, I think it's a relatively large, you know, 50, 60 members, that he can't find a single person or obtain a single letter to evidence the fact that he is a member there when this is the central, you know, the fact of his conversion is the central issue in this case. So I think that under Sidhu and then Mahia Pais, I think that the adverse credibility determination... Let me ask you a question. So, you know, in the assessment to refer with the asylum officer summarizes his interview. And he gets down on the first page of the bottom paragraph where he talks about the applicant's testimony. And then he says, applicant was asked basic questions about the Christian faith. Recite the Lord's Prayer and provide the chapter and verse in the Bible where it is found. Recite the passage from Psalm 23. How many chapters are there in the Bible? And ask the date he was baptized. Applicant became evasive and stated, I don't know the verse and chapter and I don't know the Lord's Prayer or Psalm 23. Also, he stated that he never heard the word baptized and he did not know the number of chapters in the Bible. When asked how he could not know such basic details about his religious faith, applicant became evasive and did not answer. When given the opportunity to explain, the applicant was unable to provide a reasonable explanation for these inconsistencies. These inconsistencies are material to his claim because they cast doubt on whether he is a member of the Christian faith. Now, if you were to give me that same test right now, I'd probably flunk it. And I wouldn't. So? Well, I would probably flunk it. Your Honor, I think it's not... I just find that everybody's religion, what aspect of Christianity he might be a member of and participate in, is different. And just because he couldn't answer those very precise questions about how many chapters are in the Bible or the chapter and verse... I just find that difficult. And if this were a case where the adverse credibility determination was simply that he couldn't provide this information, I think Your Honor might be correct, but that is not what this case is. It's not that he couldn't provide this information, it's that he couldn't provide... Well, as I read the rest of that statement by the asylum officer, what he said, he can't explain these basically core inconsistencies, which undermines his basis for his claim. And then the IJ relied heavily on that asylum officer's statement. Because I think... And I think it's because you have the assessment, the asylum interview where he provides no detail, no explanation, sometimes no answer. And then in his testimony, he provides a very detailed explanation of how he was baptized, where it was, it was a secret ceremony, he reads the Bible every day. It's not just a matter of what was Mr. Golkar expected to know, assuming he was in fact a Christian coming from a country where it's persecuted and he has to keep it secret. It's not simply a matter of what is he supposed to know. It's a matter of when you're asked to provide some detail, to provide where it is your burden to establish that you are eligible for asylum, he can provide no detail. And then later on, he's able to provide a great, a lot of detail. And he's not able to say, and his explanation for why he couldn't provide the detail is not, I didn't know any of these things, it's that there was a problem with the translation. But he doesn't... It's simply his statement, there was a problem with the translation, not here's my friend who will help say that this is a problem with the translation, or here's a letter from my friend or an affidavit from my friend. So I think it's not just what he was expected to know. It's the completely different pictures that you get at the asylum interview and before the IJ, and the inability to provide corroborating evidence. Counsel, if we set aside the technical questions regarding where in the Bible the lowest prayer is in the 23rd Psalms, what about the concept of baptism? Was that central to his claim? Well, I think it is central to his claim, first because he testified that he was baptized. Second, because even under, this is a pretty fundamental aspect of Christianity, and under Wang versus INS, also cited in our brief on page 19, a lack of knowledge of certain basic concepts of one's religion is central to an asylum claim. So you need to be able to provide some detail, some aspect of it. He was able to provide none, then he provides a lot, and he has no corroborating evidence for why there was a discrepancy. Thank you. Your Honor, again, the case turns into totality of the circumstances in this case, because we have to see the whole picture to find out whether we have a person who is credible, has credibly testified in proceedings, or he hasn't. The minor technical issues, as the Honor pointed out, is a point aside, the respondent hasn't embellished any issues at all. He has been truthful all throughout, he said he didn't know something, he said I don't understand, I don't know what that is, Psalm 23, and in court he didn't embellish any facts. He could have said he was tortured and run, all sorts of stuff could have happened to him. He didn't do any of that stuff, he's been very frank with the court. Where the court, as the court in Campos v. Sanchez, and also the Sotaro-Lincoln v. Gonzalez, this court held that where the respondent was asked to provide opportunity to explain, he has explained those issues. The judge asked him about his faith in Christian faith, and he was able to explain those in court. Thank you.
judges: Paez, Rawlinson, Conlon